**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**GREATER NEW YORK MUTUAL**
**INSURANCE COMPANY,**                          **19-cv-3268 (JGK)**
                          **Plaintiff,**
                                               **OPINION AND ORDER**
          **- against -**

**CONTINENTAL CASUALTY COMPANY,**

                          **Defendant.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     This case concerns a dispute between two insurance
companies as to whether those insurance companies must share the
costs of defending a state court action or whether one insurance
company must be responsible for bearing the costs of that
defense. The plaintiff, Greater New York Mutual Insurance
Company ("GNY"), issued a commercial general liability insurance
policy to 444 Park Owners, Inc. ("444") (the "GNY Policy"). The
defendant, Continental Casualty Company ("CNA") issued a
directors and officers liability policy to 444 (the "CNA
Policy"). GNY brought this suit seeking a declaratory judgment
that CNA is obligated to contribute on a co-primary basis to the
costs incurred by GNY in defending 444 in the state court action
Gale v. 444 Park Owners, Inc., pending in the New York State
Supreme Court, New York County (the "Gale Action").

     CNA moves for summary judgment, arguing that GNY's
obligation to defend at least one allegation in the Gale Action

1

entails a broad duty to defend the entire action as the primary
insurer and that the CNA Policy, pursuant to its "Other
Insurance" clause, is excess to the GNY Policy. GNY cross-moves
for summary judgment, arguing that the CNA Policy's "Other
Insurance" clause was never triggered and, therefore, CNA must
be responsible for co-primary defense coverage to 444 in the
Gale Action because CAN also had a duty to defend. For the
reasons that follow, CAN's motion is **denied** and GNY's motion is
also **denied.**

### I.

The following facts are undisputed unless otherwise noted.

### A.

In 2008, 444, a residential cooperative located at 444
Central Park West in New York City (the "Premises"), purchased
insurance from both GNY and CNA. Compl. ¶¶ 9–11.

GNY issued a commercial general liability ("CGL") insurance
policy, providing coverage, under Coverage Part A, for "sums
that the insured becomes legally obligated to pay as damages
because of 'bodily injury' or 'property damage' that is caused
by an 'occurrence' and occurs during the policy period." ECF.
No. 27, Ex. 1 ("Pl.'s Rule 56.1 Stmt.") ¶ 9. "Occurrence" is
defined by the policy as "an accident, including continuous or
repeated exposure to substantially the same general harmful
conditions." Compl., Ex. 2 ("GNY Policy") at 26. The GNY Policy

defines "property damage" to mean "[p]hysical injury to tangible property, including all loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." GNY Policy at 27.

The GNY Policy's Coverage Part B covers "personal and advertising injury" caused by an offense arising out of the insured's business, where the offense was committed during the policy period. Pl.'s Rule 56.1 Stmt. ¶ 11. "Personal and advertising injury" is defined by the policy as injuries resulting from one of the following offenses:

> a. False arrest, detention or imprisonment;
> b. Malicious prosecution;
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
> f. The use of another's advertising idea in your "advertisement"; or
> g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

GNY Policy at 26.

CNA issued a community association directors and officers liability ("D&O") insurance policy, providing coverage for any "[l]oss resulting from any Claim first made against any . . .

Named Entity. . . during the Policy Period . . . for a Wrongful
Act committed, attempted, or allegedly committed or attempted,
by such Named Entity Insured before or during the Policy
Period." Def.'s Rule 56.1 Stmt. ¶ 31-32; Pl.'s Rule 56.1 Stmt. ¶
31-32. "Loss" under the CNA Policy is defined to mean "damages,
settlements, judgments (including any award of pre-judgment) and
Defense Costs for which the Named Entity Insureds are legally
obligated to pay on account of a covered Claim." Compl., Ex. 3
("CNA Policy") at 24; Def.'s Rule 56.1 Stmt. ¶ 33; Pl.'s Rule
56.1 Stmt. ¶ 33. The CNA Policy defines "claim" to mean among
other things "a written demand for money damages for a wrongful
act" or "a civil proceeding against a Named Entity Insured for a
Wrongful Act, including any appeal therefrom . . . ." CNY Policy
at 24. "Wrongful Act" is defined by the policy to mean "any
actual or alleged error, misstatement, misleading statement,
act, omission, neglect or breach of duty committed or attempted
by" the insured in an insured capacity. Id. at 25; Def.'s Rule
56.1 Stmt. ¶ 34; Pl.'s Rule 56.1 Stmt. ¶ 34.

The CNA Policy includes coverage of "wrongful entry or
eviction, or other invasion of the right to private
occupancy. . . ." CNA Policy at 26. It expressly excludes
coverage for "any Loss in connection with any Claim . . . based
upon, directly or indirectly arising out of, or in any way
involving any . . . damage to tangible property, loss of use or

view, or destruction or deterioration of any tangible property,

or failure to supervise, repair or maintain tangible property."

Def.'s Rule 56.1 Stmt. ¶ 35; Pl.'s Rule 56.1 Stmt. ¶ 35.

The policy period for both the GNY Policy and the CNA

Policy ran from February 1, 2018 to February 1, 2019. Def.'s

Rule 56.1 Stmt. ¶ 31; Pl.'s Rule 56.1 Stmt. ¶ 8. As such, both

policies were in effect at the time of the alleged conduct at

issue in the Gale Action. Def.'s Rule 56.1 Stmt. ¶ 39; Pl.'s

Rule 56.1 Stmt. ¶ 39.

Both the GNY Policy and the CNA Policy contain "Other

Insurance" clauses. The GNY Policy's "Other Insurance"

clause provides:

> This insurance is primary except when [a
> number of conditions which are not relevant
> in this case occur.] If this insurance is
> primary, our obligations are not affected
> unless any of the other insurance is also
> primary.

Pl.'s Rule 56.1 Stmt. ¶ 30; Def.'s Rule 56.1 Stmt. ¶ 30.

In contrast, the CNA Policy's "Other Insurance" clause

states:

> If any Loss resulting from any Claim is
> insured under any other policies, this
> Policy shall apply only to the extent the
> Loss exceeds the amount paid under such
> other valid and collectible insurance
> whether such other valid and collectible
> insurance is stated to be primary,
> contributory, excess, contingent or
> otherwise, unless such other valid and

5

collectible insurance is written only as
specific excess insurance over this Policy.

Pl.'s Rule 56.1 Stmt. ¶ 38; Def.'s Rule 56.1 Stmt. ¶ 38.

**B.**

GNY seeks to hold CNA liable for an equitable share of the costs that GNY expends in the defense of 444 in the Gale Action. The occurrence that formed the basis for the Gale Action occurred from May 2018 to December 2018. Compl., Ex. 1 ("Gale Compl.") ¶ 13–14.

The Gale Action, brought in February 5, 2019, alleges damages to plaintiffs Barden and Flavia Gale, tenant-shareholders of the cooperative owning corporation 444, arising out of construction work at the Premises. Gale Compl. ¶ 9.

The Gales own shares in 444, which provides them with a proprietary lease to Unit 19B, including its adjacent terraces on the 17th and 18th floors of the building, as well as a separate proprietary lease for a terrace on the roof of the building ("Roof Terrace"). Gale Compl. ¶¶ 5, 7. The Gale Action alleges that in March 2018, 444 informed the Gales that 444 would need access to the Roof Terrace to conduct construction work in order to repair a leak from a terrace on the 17th floor owned by another shareholder. Gale Compl. ¶ 11–12; Def.'s Rule 56.1 Stmt. ¶ 6; Pl.'s Rule 56.1 Stmt. ¶ 6. The construction was allegedly estimated to last between 10 to 12 weeks and be

limited to worker access only, Gale Compl. ¶ 12, but ended up spanning much longer, namely from March to December 2018, Gale Compl. ¶¶ 1, 13-14.

The Gales alleged that the construction workers had installed and stored construction materials on the Gales' Rooftop Terrace, "effectively turning the Roof Terrace into a construction site that could not be accessed by the Gales." Def.'s Rule 56.1 Stmt. ¶ 8; Pl.'s Rule 56.1 Stmt. ¶ 8. In July 2018, the Gales allegedly informed 444 that "they were completely unable to access the Roof Terrace" and "that the entire Roof Terrace was in any case totally unusable as well as inaccessible." Def.'s Rule 56.1 Stmt. ¶ 9; Pl.'s Rule 56.1 Stmt. ¶ 9. They also alleged that their deck furniture "had been piled up haphazardly and that some of the deck furniture may have suffered damage." Gale Compl. ¶20; see Def.'s Rule 56.1 Stmt. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 10. The Gales further alleged that during construction, workers were on the Gales' 17th and 18th floor terraces and had a "direct line of sight" into the Gales' unit including the master bedroom and bath and living room, resulting in the Gales having to leave their unit often during construction. Gale Compl. ¶¶ 15-17; Def.'s Rule 56.1 Stmt. ¶ 7; Pl.'s Rule 56.1 Stmt. ¶ 7.

In response to the Gales' allegedly informing 444 in July 2018 that the Roof Terrace was inaccessible, 444 allegedly

informed the Gales in late July 2018 that the construction
workers were told only to access areas necessary for the
construction work and not to linger on the Gales' terraces or
touch any personal property belonging to the Gales. Gale Compl.
¶ 21. In the same response, 444 allegedly informed the Gales
that the Roof Terrace and the Gales' other terraces were "an
active construction site and should never be entered by your
[sic] or your guests until the work is completed and the
equipment and protections are removed." Gale Compl. at ¶ 21. The
construction work allegedly ended on December 12, 2018, although
scaffolding allegedly still remained at the time of commencement
of the underlying action. Gale Compl. at ¶ 14.

While the Gales acknowledged that 444 was entitled to use
the Roof Terrace to perform the work, the Gales allege that
444's conduct in overseeing the repairs was unreasonable. Gale
Compl. ¶¶ 29, 30. The Gale Action alleges that the Gales have
been "unreasonably and unfairly denied the use and enjoyment of
their property, and the sanctity of their home has been violated
— and their privacy severely invaded — through the continuous
and objectionable presence and conduct of [444]'s construction
personnel in plaintiffs' home." Gale Compl. ¶ 1; Def.'s Rule
56.1 Stmt. ¶ 3; Pl.'s Rule 56.1 Stmt. ¶ 3. The Gale Action
alleges causes of action for breach of contract, partial
constructive eviction, constructive eviction, breach of

fiduciary duty, breach of warranty of habitability, and loss of use/value. Compl. ¶ 9; Gales Compl. ¶¶ 24-89.

In March 2019, representatives from CNA and GNY discussed through email the insurers' respective coverage positions regarding the Gales Action. Def.'s Rule 56.1 Stmt. ¶ 18; Pl.'s Rule 56.1 Stmt. ¶ 18; Thiergartner Decl. ¶ 7. In an email dated March 12, 2019, GNY informed CNA that GNY was "accepting primary coverage on defense." Thiergartner Decl. at ¶ 8; Def.'s Rule 56.1 Stmt. ¶ 19; Pl.'s Rule 56.1 Stmt. ¶ 19. CNA then informed GNY that the CNA Policy "was excess and [CNA] is not obligated to pay defense costs." Thiergartner Decl. ¶ 9; Def.'s Rule 56.1 Stmt. ¶ 20; Pl.'s Rule 56.1 Stmt. ¶ 20. Subsequently, GNY filed this action against CNA on April 12, 2019. Def.'s Rule 56.1 Stmt. ¶ 21; Pl.'s Rule 56.1 Stmt. ¶ 21.

GNY asserts that the only allegation covered by the GNY Policy is the single allegation that that there may have been "property damage" to the Gales' deck furniture, Compl. ¶¶ 25, 27, and, in a letter issued to 444 on April 14, 2019, states "it is for this reason alone that GNY will defend [444] under a reservation of rights to deny coverage for all non-covered damages." Thiergartner Decl., Ex 3. at 5.

**C.**

On April 11, 2018, GNY filed the present action against
CNA. Jurisdiction is based on diversity of citizenship. 28
U.S.C. § 1332. GNY alleges three causes of action and
corresponding remedies: (1) declaratory judgment that CNA is
obligated to participate in the defense of 444 in connection
with the Gale Action on a co-primary basis with GNY; (2)
declaratory judgment that CNA is liable for an equitable
contribution of defense-related costs incurred on behalf of 444
in connection with the Gale Action; and (3) recovery for damages
related to overpayment of defense-related costs incurred by GNY
in connection with the Gale Action.

On June 6, 2019, CNA answered GNY's complaint. Both GNY and
CNA have now moved for summary judgment.

**II.**

The standard for granting summary judgment is well
established. "The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett,
477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the
summary judgment motion stage of the litigation is carefully
limited to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them. Its duty, in

short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532

(2d Cir. 1993). If there are cross-motions for summary judgment, the Court must assess each of the motions and, drawing all reasonable inferences against the party whose motion is under consideration, determine whether either party is entitled to judgment as a matter of law. See Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010).

Under New York law, which both parties agree applies in this diversity case, "insurance policies are interpreted according to general rules of contract interpretation." Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 98 (2d Cir. 2012). Courts must "give effect to the intent of the parties as expressed in the clear language of their contract." Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co., 702 F.3d 118, 122 (2d Cir. 2012) (quoting Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir.2002) (internal quotation marks omitted)). Accordingly, summary judgment on the meaning of an insurance policy is appropriate when the terms of a policy are unambiguous. Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

"The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." Law Debenture Trust, 595 F.3d at 465-66 (collecting cases); accord In re Prudential Lines Inc., 158 F.3d 65, 77 (2d Cir. 1998) (citation omitted). Policy terms are unambiguous where they

provide "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Olin, 704 F.3d at 99 (citation and internal quotation marks omitted). Where, on the other hand, contract terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," the contract terms are ambiguous. Id. (citation and internal quotation marks omitted). Where the meaning of particular contract clauses is disputed, the task of the court "is to determine whether such clauses are ambiguous when read in the context of the entire agreement." Law Debenture Trust, 595 F.3d at 467 (quoting Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)). "[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." Id. (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 300 (2d Cir. 1996)); see also Hudson-Port Ewen Assocs., L.P. v. Kuo, 578 N.E.2d 435 (N.Y. 1991). "If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to

13

alter or interpret its meaning." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993); accord Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002); W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990). If the meaning of contractual language is otherwise plain, the language "does not become ambiguous merely because the parties urge different interpretations in the litigation." Law Debenture Trust, 595 F.3d at 467 (collecting cases). Instead, each party's interpretation must be reasonable. Id. An interpretation is not reasonable if it strains the policy language "beyond its reasonable and ordinary meaning." Id. (citing Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590, 593 (N.Y. 1957)).

### III.

It is well settled under New York law that "if any of the claims against an insured arguably arise from covered events, the insurer is required to defend the entire action." Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co., Inc., 945 N.E.2d 1013, 1018 (N.Y. 2011) (citations and internal quotation marks omitted). "An insurer's duty to defend is liberally construed and is broader than the duty to indemnify, in order to ensure an adequate defense of the insured, without regard to the insured's ultimate likelihood of prevailing on the merits of a claim." Id. at 1017–18 (citation, internal quotation marks, and brackets

omitted). The insurer's broad duty to defend arises whenever the allegations in the complaint of the underlying action, construed liberally, suggest a reasonable possibility of coverage. See Auto. Ins. Co. of Hartford v. Cook, 850 N.E.2d 1152, 1155 (N.Y. 2006). "If the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend." Town of Massena v. Healthcare Underwriters Mut. Ins. Co., 779 N.E.2d 167, 170 (N.Y. 2002). "It is immaterial that the complaint against the insured asserts additional claims which fall outside the policy's general coverage." Fieldston, 945 N.E.2d at 1018 (citations and quotation marks omitted).

Here, the GNY Policy's Coverage Part A clearly covers the allegation of possible property damage. The GNY Policy's "Other Insurance" clause provides that it is primary except when a number of conditions which are not relevant in this case occur. As such, GNY has the duty to defend all causes of action in the underlying Gale Action.

CNA argues that GNY's obligation to defend the entire action means that the CNA Policy, pursuant to the plain language of its "Other Insurance" clause, must necessarily be excess to the GNY Policy. "It is settled that a primary insurer has the obligation to defend without any entitlement to contribution from an excess insurer." Firemen's Ins. Co. v. Fed. Ins. Co., 649 N.Y.S.2d 700, 700 (App. Div. 1996). However, the CNA

Policy's "Other Insurance" clause is not necessarily triggered by GNY's broad duty to defend based on the allegation of property damage. Instead, the CNA Policy's "Other Insurance" clause, when read in the context of the entire policy, unambiguously provides that the CNA Policy is excess to another policy where both policies cover the same risk. The CNA Policy's "Other Insurance" clause provides that the CNA Policy applies in excess of any other policy "[i]f any *Loss* resulting from any *Claim* is insured under any other policies." Def.'s Rule 56.1 Stmt. ¶ 38 (emphasis added); Pl.'s Rule 56.1 Stmt. ¶ 38. "Loss" is in turn defined in relevant part as "Defense Costs . . . on account of a *covered* Claim, CNA Policy at 24 (emphasis added); Def.'s Rule 56.1 Stmt. ¶ 33; Pl.'s Rule 56.1 Stmt. ¶ 33. "Claim" itself is defined by the CNA Policy in relation to a "wrongful act", which is defined by the CNA Policy in relation to an act by the insured in an *insured* capacity. CNA Policy at 25; Def.'s Rule 56.1 Stmt. ¶ 34; Pl.'s Rule 56.1 Stmt. ¶ 34. Accordingly, the CNA Policy would be excess only where there is a claim that is mutually covered under both policies.

CNA relies on two cases to support its argument that the CNA Policy, pursuant to its "Other Insurance" clause, is necessarily excess to the GNY Policy on account of GNY's broad duty to defend the insured. However, both cases are distinguishable. CNA first cites to <u>Fieldston</u>, where the New

16

York Court of Appeals held that a D&O policy was excess to a CGL policy where the policies were, respectively, identical in all relevant parts to CNA's D&O policy and GNY's CGL policy. 945 N.E.2d at 1018.

In Fieldston, Hermitage Insurance issued a "per occurrence" CGL policy to a property owners association that, like GNY's policy, covered "property damage," and "personal and advertising injury." See id. at 1015. The Hermitage policy contained an "Other Insurance" clause that was identical to the clause in the GNY policy: "[t]his insurance is primary except when [a number of conditions which are not relevant in this case occur.] If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary." Id.

The property owners association also purchased a "claims made" D&O policy from Federal Insurance that contained an "Other Insurance clause" that, like the clause in CNA's D&O policy, provided:

> If any Loss arising from any claim made against the Insured(s) is insured under any other valid policy(ies) prior or current, then this policy shall cover such Loss, subject to its limitations, conditions, provisions, and other terms, only to the extent that the amount of such Loss is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the limits provided in this policy.

Id. Further, Federal's D&O policy, like the CNA Policy, defined "Loss" with the conditional requirement that it be on account of a covered claim. See id. ("Loss" was defined in Federal's D&O policy to mean "the total amount which the Insured(s) becomes legally obligated to pay on account of all claims made against it for Wrongful Acts with respect to which coverage hereunder applies, including . . . Defense Costs.").

However, Fieldston involved an action where the parties had conceded the possibility that both policies concurrently covered at least one cause of action. The ruling of the New York Court of Appeal appears to be confined to this narrow set of facts. See id. at 1017 ("Here, the parties have conceded at least the possibility that both Hermitage's CGL and Federal's D&O policies cover the injurious falsehood claims in the two underlying actions. Thus, based on the 'other insurance' clauses, Hermitage's CGL policy is primary to Federal's D&O policy as they relate to defense costs."). Because it was primary insurance with respect to at least one common claim, the New York Court of Appeals held that the CGL insurer had the obligation to defend all the claims. Id. at 1018.

The second case that CNA cites in support is Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am., where this Court found that a claims made D&O insurance issued by Travelers Casualty and Surety Company was excess to an occurrence-based CGL

18

insurance issued by Admiral Indemnity Company. 881 F. Supp. 2d
570 (S.D.N.Y. 2012). Admiral's CGL policy contained an "Other
Insurance" clause that was identical to GNY's "Other Insurance"
clause, stating:

> This insurance is primary except when [a
> number of conditions which are not relevant
> in this case occur.] If this insurance is
> primary, our obligations are not affected
> unless any of the other insurance is also
> primary.

Id. at 571-72. Meanwhile, Traveler's D&O policy provided:

> If any Loss otherwise covered under this
> Policy is Insured under any other valid and
> collectible Policy or policies, then this
> Policy shall apply only in excess of the
> amount of any deductibles, retentions and
> limits of liability under such other
> insurance, whether such other insurance is
> stated to be primary, contributory, excess,
> contingent, or otherwise unless such other
> insurance is written specifically excess of
> this Policy by reference in such other
> Policy to the Policy Number of this Policy.

Id. at 572. However, the definition of "Loss" in the Traveler's
D&O policy was broader than the definition of "Loss" in the the
CNA policy in this case. Traveler's D&O policy defined "Loss" as
"the total amount . . . which any Insured becomes legally
obligated to pay as the result of *all Claims* . . . made against
any Insured." Plaintiff's Rule 56.1 Statement ¶7, Admiral Indem.
Co. v. Travelers Cas. & Sur. Co. of Am, 881 F. Supp. 2d 570
(S.D.N.Y. 2012) (No. 11 Civ. 1158) (emphasis added).

In contrast to the broader language of the "Other Insurance" clause contained in Traveler's D&O policy, the CNA Policy's "Other Insurance" clause adds a conditional excess requirement providing that the CNA Policy is excess "[i]f any *Loss* resulting from any *Claim* is under any other policies", Def.'s Rule 56.1 Stmt. ¶ 38 (emphasis added); Pl.'s Rule 56.1 Stmt. ¶ 38, where "loss" is further conditioned to be on account of "a *covered Claim*". CNA Policy at 24 (emphasis added).

As such, the Fieldston court's ruling and this Court's ruling in Admiral are distinguishable and do not support CNA's argument that the CNA Policy, pursuant to its "Other Insurance" clause, must necessarily be excess to the GNY Policy on account of GNY's broad duty to defend the insured.

Instead, GNY asserts that the only allegation that is covered by the GNY Policy is the single allegation of possible property damage, and, because property damage is not concurrently covered by both policies, the CNA Policy is not excess to the GNY Policy. Indeed, if property damage were to be the only allegation covered under the GNY Policy, the CNA Policy's "Other Insurance" clause would not be triggered, because the CNA Policy expressly excludes coverage for property damage; if this were the case, CNA would be obligated to contribute on a co-primary basis to the defense costs incurred by GNY in the Gale Action.

20

It was unclear from the cross-motions for summary judgment whether the parties agreed that there was any claim in the Gale action that was insured under both the GNY and the CNA policies, such that the excess insurance clause in the CNA Policy was triggered. The Court asked for supplemental briefing. Not surprisingly, CNA argued that there was a common risk and GNY argued that there was not.

CNA asserts that the underlying allegations in the Gale action of constructive eviction, partial constructive eviction, and invasion of privacy fall under the GNY Policy's coverage of "personal and advertising injury", defined as injuries arising, in relevant part, from "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room." GNY Policy at 26. GNY argues that the allegations of constructive eviction, partial constructive eviction, and invasion of privacy do not fall under its "personal and advertising injury" coverage because its "personal and advertising injury" coverage is limited to liability for allegations of intentional dispossession. Pl.'s Mem. Supp. Summ. J. Cross-Motion 15–16. GNY asserts that there were no allegations of intentional dispossession, because the complaint acknowledges that the areas at issue were to be returned to the Gales after completion of the construction, and that the allegations were instead that the construction took longer than

expected and that 444 had exceeded the right to reasonable access of the Gales' Roof Terrace for repair. GNY thus argues that because there were no allegations of intentional dispossession, or in other words, allegations of actual eviction its "personal and advertising injury" coverage was not triggered, leaving the allegation of potential property damage as the only allegation covered by the GNY Policy and property damage is excluded from coverage under the CNA Policy. Id.

The parties' papers are not sufficient to decide as a matter of law whether the allegations of constructive eviction or partial constructive eviction in the underlying Gale Action are covered under the GNY Policy's "personal and advertising injury" coverage. Therefore, the Court cannot decide on the current papers whether the allegation of property damage is the only allegation covered under the GNY Policy and, consequently, cannot decide whether the CNA Policy is excess to the GNY Policy with respect to the allegations in the Gale action. Summary judgment must therefore be denied to both parties.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, CNA's motion for summary judgment is **denied** and GNY's

cross-motion for summary judgment is **denied.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:**      **New York, New York**
               **September 8, 2020**

                                      **/s/ John G. Koeltl**
                                      **John G. Koeltl**
                             **United States District Judge**